## ALLIED BRIDGE & CONSTRUCTION CO. v. DANVILLE SANITARY DIST.

No. 7151.

Circuit Court of Appeals, Seventh Circuit.

Aug. 8, 1940.

Rehearing Denied Sept. 25, 1940.

Paul F. Jones, Thos. A. Graham, and V. W. McIntire, all of Danville, Ill., for appellant.

Louis L. Cohen, of Chicago, Ill., and Harold F. Lindley, of Danville, Ill., for appellee.

Before EVANS, MAJOR, and KERNER, Circuit Judges.

KERNER, Circuit Judge.

The Allied Bridge and Construction Company (Delaware corporation) brought this action against the Danville Sanitary District. (Illinois Municipal Corporation) to recover $25,282.14 for extra work done and material furnished in the construction of a system of intercepting sewers within the corporate limits of Danville, Illinois. The District Court heard the case without a jury and rendered a judgment of $13,-639.16 in favor of plaintiff. From the judgment this appeal was prosecuted.

The complaint contained four counts, two of which are pertinent in view of the evidence. The second count charged that the written contract which embodied the plans and specifications relating to the construction, set "forth in detail the location, size, depth, elevation and other specifications in respect to said intercepting sewers"; and that during the performance of the contract the defendant directed the plaintiff to build the sewers at a depth 1.16 feet below the level specified in the contract, plans and specifications. The third count charged that the contract above described, "in particular specified the elevation at which said sewers would have to be constructed"; that plaintiff investigated the site of the construction in reliance upon the correctness of this and made its bid thereon; that during the performance of the contract the defendant directed the plaintiff to construct the sewers at a level 1.16 feet below the level specified in the plans; and that as a result of this direction the plaintiff encountered an excess of underground water, which caused additional labor and equipment costs in dewatering the sewer trenches.

In its answer the defendant largely denied the allegations of the complaint. It averred that the alleged extras were in fact part of the work required by the written contract, for which plaintiff had been fully paid. It denied that it directed the plaintiff to construct sewers at a depth below the level specified by the contract, and it declared that the contract required the plaintiff to examine the plans and specifications and to inspect the entire site of the construction work to the end that no plea of ignorance as to existing conditions be made later.

*Facts.* In the fall of 1935 the Danville Sanitary District planned the construction of a sewer system within the corporate limits of Danville. For this purpose it caused plans to be drawn and specifications to be prepared by its engineers, Greeley and Hansen. Then it asked for bids and to bidders were submitted a set of these plans and specifications. Each bidder was required to examine all drawings and data mentioned in the specifications and plans and to investigate the entire site of the construction, to the end that "No plea of ignorance of conditions that exist * * * as a result of a failure to make the necessary examinations and investigations * * * will be accepted as a basis for any claims whatsoever for extra compensation." Another instruction to bidders provided that "If any person contemplating a bid for the proposed contract is in doubt as to the true meaning of any part of plans * * *, he may submit to the Engineer a written request for an interpretation thereof * * *. The Engineer or Owner will not be responsible for any other explanations or interpretations * * *."

The location of the construction work, together with the contours and profiles of the ground, were shown on the plans in the form of drawings. The drawings located points or stations along the course of construction which in general followed the course of Stony Creek through the city. The drawings produced a profile of the proposed sewer showing the surface of the ground, Stony Creek, the invert of the sewer (the lowest point in the curvature in the lower half of the sewer pipe), and the elevations. The vertical scale on the profile was one foot per line and the figures at the right of this scale were elevation marks, so that from this data the distance from the surface of the ground to the invert of the sewer could be determined by counting the lines on the scale. In addition the drawings gave the invert elevation (the elevation at the invert of the sewer) at the various stations along the course of construction.

The contract provides that "In any case of discrepancy in the figures or drawings, the matter shall be immediately submitted to the City Engineer without whose decision said discrepancy shall not be adjusted by the Contractor, save only at his own risk and expense." The general specifications which form a part of the contract, provide that "Where figures are shown on the drawings they shall take precedence over scaled distances and dimensions" and "The Contractor will not be allowed to take advantage of any error or omission

in the drawings, as full instructions will be furnished by the Engineer should such error or omission be discovered, and the Contractor shall carry out such instructions as if originally specified."

In our 'case the plans (containing the drawings) failed to indicate what bench mark or datum level was utilized by the engineering draftsmen who designed the sewer. The plaintiff adduced expert opinion evidence which declared that when such a situation arose, it was engineering custom to assume that the elevation figures shown on the plans refer to the United States Geodetic Survey datum or sea level (hereinafter also referred to as the "U. S. G. S." datum). Defendant's expert opinion evidence indicated that often different datum planes were employed, and that in Illinois it was customary to utilize four datum planes, i. e., U. S. G. S. datum, City datum, Lake datum, and any other assumed datum.

In this connection, Nemoyer, witness for defendant and the engineer who supervised the preparation of the plans, testified that in designing the sewer the survey bench marks, established by the city engineer, were actually used; that the U. S. G. S. bench mark had nothing to do with the plans, but that he did not know whether the city engineer had started from the U. S. G. S. bench mark in making his survey. In this regard the Sick memorandum evidence, later to be discussed, is pertinent. The evidence also indicates that the plan elevations were very close to elevations reflecting U. S. G. S. datum, that the construction site was near the Government bench mark, and that these intercepting sewers were to be tied into an already existing sewer structure.

Prior to submitting a bid the plaintiff studied the plans and specifications and then went to the construction site at Danville to investigate the character of the soil and the underground conditions. In this inspection Cathroe (plaintiff's vice president) drilled six test holes of from nine to twelve feet in the way described below, and the result of these borings indicated that he could expect eight inches to ten inches of water in the first 1,000 feet of the construction and none in the last 7,200 feet. That is, these tests showed that the depth of the water encountered would grow less as the digging progressed toward the upper end of the sewer trench and that no substantial amount of water

would be encountered after the first thousand feet of digging, except at the places where the sewer would cross Stony Creek.

In his inspection Cathroe assumed that the plan elevations were fixed in accord with the U. S. G. S. bench mark. First, he determined the surface elevation independently of the scaled surface elevation shown on the plans. That is, starting from the Government bench mark in the Federal Building in Danville and using survey instruments, he ran the levels from there to the various stations selected for test borings. Second, he accepted the invert elevation shown on the plans and assumed it to be based on the Government bench mark. And third, he subtracted the second figure from the first one. The difference constituted the depth of the cut, i. e., the number of feet required to be dug in order to reach the invert level of the trench. Using this data he drilled six test holes, and in reliance upon this inspection the plaintiff submitted its bid which was accepted by the defendant.

The operation of the sewer construction was begun in March of 1936 and was finished by November or December of that year. On the first day of digging Sick (defendant's resident engineer) and McCann (defendant's inspector engineer) directed the plaintiff to start the sewer at a level with the invert of the existing sewer. The level of the old sewer was .4 of a foot lower than the plan invert level of the new sewer and this difference in the grade remained constant throughout the construction. As the work progressed, McCann would drive grade stakes into the ground which fixed the depth of the cut but which did not show the invert elevations, and plaintiff's employees then would dig to the depth indicated. From his inspection Cathroe had expected to find water in the first 1,000 feet and a dry trench in the last 7,200 feet of the sewer. However, as the construction progressed, he encountered unanticipated water and he was compelled to use a well point system in order to dewater the trench. He never complained to the defendant's engineers because he assumed that he had made an error in his inspection calculations.

As the construction neared completion the plaintiff received information leading it to believe that subsequent to the letting and prior to actual pipe laying, the grade of the entire sewer had been lowered substantially without its knowledge. Accord-

ingly in July of 1937 Cathroe made a re-check and found that the invert level of the sewer as constructed, if the U. S. G. S. datum plane were applied, was 1.12 to 1.16 feet lower than the plan invert level. In this regard it appears that prior to excavation McCann had checked the plan elevations with the U. S. G. S. elevations, had found a variation of over one foot, and had reported this to Sick.

On December 19, 1937, Sick by written memorandum reported to Greeley and Hansen: that just before the first pipe was laid, Sick discovered through McCann "for the first time that the U. S. G. S. datum did not check with the survey benches on the sewer * * * and that the net effect of the following the U. S. G. S. bench would be to raise the sewer approximately one foot above the survey datum"; that Sick "could not penalize the contractor and give any deeper cuts than shown on the plans, or he would be able to substantiate claims for extras"; that Sick was also "reluctant to penalize the district by conforming to U. S. G. S. datum, as this would raise the sewer a dangerous amount, due to * * * creek crossings and * * * main sewer crossings, where it was assumed the existing sewer was layed close to a minum grade"; that Sick "therefore ordered the sewer grade placed so as to conform to the survey benches"; that McCann then informed him that "the survey benches were off a variable amount from the time they had rerun on them for construction"; that since McCann did not have the available data as to the variance and since pipe laying was to start at once, Sick "gave permission to start the sewer in the morning at the lowest grade (top of new sewer invert to match top of old sewer invert) providing the cuts checked within a reasonable amount of the plans"; that McCann informed him later that the cuts checked within one-half a foot; that after construction had begun Sick informed "Nemoyer concerning the change in the grade, explaining that we were using survey benches corrected for construction, rather than the U. S. G. S."; and that prior to working on the final plan sheets, Sick discussed the "difference between U. S. G. S. grades and survey bench grades with Fred McCann so as to apply the final revision to the plans," at which time McCann informed Sick that "there was also the .4 foot difference, due to our lower start below the survey benches."

Thereafter, upon the completion of the sewer, the final completed plans were sent by Greeley and Hansen to the defendant, on which was produced the following legend: "Grade change, entire line, deduct 1.12 feet from plan elevations for both sewer invert and ground surface to conform to U. S. G. S. elevations as run from bronze tablet on Post Office." This legend did not appear on the plans delivered to the plaintiff and did not come to its attention until completion of the work. In April of 1937 Greeley and Hansen made its final report to the Danville Sanitary District. A pertinent part of this report stated that "Bench marks for the sewer were rerun from the U. S. G. S. datum and found to be in error by an average of 1.12 feet. Some individual benches were in error by larger amounts. The grades of the sewer were lowered 1.12 feet from that shown on the plans, using U. S. G. S. datum, but as the original ground elevation was in error, a similar amount using this datum, the depth of cuts remain the same. Check on cuts indicated several tenths of a foot variation, with five tenths foot variation at some points."

Thus it happened that plaintiff complained that lowering the sewer level as above described, lowered the grade to a point where there was an excess of underground water, greatly increasing the cost of construction. The defendant denied that there had been any change in the grade, asserting that the discrepancy arose because Cathroe had used the U. S. G. S. bench mark as a basis for its survey, whereas the defendant had utilized an arbitrary bench mark established by the city engineer.

*What Bench Mark Used.* Counsel devote considerable attention to the question of what bench mark was used in the design of the plans. In this particular the plans indicated invert and surface elevations but failed to refer to a bench mark or base, nor did the specifications indicate the use of an arbitrary bench mark. Plaintiff adduced evidence that when such is the situation, standard engineering practice is that the U. S. G. S. bench mark is to be used. In his opinion the District Judge stated that "I do not find this evidence substantially controverted and accept it as a fact." We are satisfied that the record supports the District Court. Plaintiff had a right to believe that the elevations were fixed by a survey starting from

the United States Geological Survey bench mark.

In connection with this point it is proper to consider the Sick memorandum, McCann's and Nemoyer's testimony, Greeley and Hansen's legend addition and Greeley and Hansen's final report. Counsel for the plaintiff argues from this evidence that the defendant intended to use the U. S. G. S. bench mark in the design of the plans, and that Nemoyer's testimony to the contrary can not stand in the face of it. Counsel's argument is not supported by a District Court finding, nor did the District Court discredit this part of Nemoyer's testimony. In fact the court below arrived at its conclusion regardless of "whatever may have been defendant's original intention with regard to its basic bench mark." It is our conclusion that counsel's argument does not lend itself to all the facts and that the fact inference he urges upon us is not supported by the record.

But the District Court did consider the evidence described in the preceding paragraph. This consideration led the court below to state that "it appears that whatever may have been defendant's original intention with regard to its basic bench mark * * * it, subsequent to the letting, altered and modified the elevation of the sewer to conform to the Geological Survey bench mark, fixed the grade accordingly and required plaintiff to construct the sewer on a level 1.12 feet lower than that shown in the plans and specifications upon which plaintiff's bid was made. * * * This modification, unknown to plaintiff * * *, did not increase the amount of excavation * * * but did * * * lower the grade to a point where there was an excess of underground water." In this connection the court below explained that during the construction the "defendant, without communicating the information to plaintiff, directed the construction of the sewer by grade stake bench marks corrected to conform to the Geological Survey bench marks at the increased depth, instead of the depths determined by the original plans and profiles."

Obviously the District Court did not mean that the directions on the grade stakes called for deeper cuts than the plans required, for admittedly there was no material increase in the amount of excavation. What actually was done during construction of the sewer, is disclosed by the Sick memorandum. This documentary evidence indicates that the sewer was placed in the ground at the old sewer invert level. It follows that our problem is to ascertain whether laying the sewer at this level constituted a material change in the plans. Certainly using the old sewer invert level did not necessarily mean that the plans were modified "to conform to the Geological Survey bench mark." In fact the Sick memorandum is plain to the effect that the U. S. G. S. was not used during construction. Otherwise the statement therein that "we were using survey benches corrected for construction, rather than the U. S. G. S.," means nothing at all.

*Change in Plans.* Our problem narrows down to the question as to whether defendant's direction to start and maintain the sewer at the invert level of the old sewer with which it was to connect, constituted a material change in the plans upon which plaintiff's bid was made. In essence plaintiff's theory of recovery is based on the following steps: the plans contained elevation figures but failed to refer these figures to a base; under these circumstances plaintiff had a right to assume the figures referred to the U. S. G. S.; the sewer was laid at an invert level, applying the U. S. G. S., from 1.12 to 1.16 feet lower than the plan invert level. To illustrate further, the plans indicated the invert elevation at station 0+00 to be 550.5; applying the U. S. G. S. datum, the sewer was laid at 549.3. As a result of this lowering of the level, according to plaintiff, an unanticipated quantity of underground water was encountered.

The plans provided certain invert elevation figures and furnished profile data by which the surface elevations could have been determined. For instance the difference in elevation between the ground surface and the sewer invert is shown on the plans and the depth of any cut at any point along the course of construction is available. The evidence is undisputed that in general the plan elevations for both sewer invert and ground surface were 1.12 feet to 1.16 feet greater than elevations reflecting the U. S. G. S. datum plane. This discrepancy did not increase the amount of excavation because the invert and surface figures shown on the plans were in proper relation to each other. That is to say, the application of the U. S. G. S. datum to the plans would not have resulted in a different cut. To illustrate, the plans show the invert and surface figures

at station 0+00 to be 550.5 and 562; applying the U. S. G. S. datum, these figures are 549.3 and 560.8 respectively; using either set of figures the cut is 11.5 feet deep.

In the inspection Cathroe accepted the plan invert figures and assumed them to be correct and as reflecting U. S. G. S. datum. He ignored completely the ground surface elevations available to him by reference to the plans and determined these surface elevations independently of the plans. Then he accepted these figures as correct although they were inconsistent with the plan surface figures. To illustrate what happened, let us assume that the plaintiff inspected the underground conditions at station 0+00. From a study of the plans the following data was available to the plaintiff: invert elevation, 550.5 feet; surface elevation, 562 feet; depth of cut, 11.5 feet. Instead of this information the plaintiff used the plan invert elevation of 550.5 feet, determined independently of the plans the surface elevation of 560.8, and drilled a test hole of 10.3 feet. Then it prepared its bid on the theory that it would have to dig 10.3 feet. Of course the plans informed plaintiff to dig 11.5 feet and in the construction of the sewer it dug 11.5 feet.

When excavation started the plaintiff was directed to dig .4 of a foot more in order to coincide with the level of the old sewer. In this respect the construction varied from the plans. However, a variance of .4 of a foot is not considered unusual or unreasonable in engineering circles, nor does plaintiff claim this variance to be material. In fact plaintiff does not claim extras for having to dig more than the plans required; admittedly it dug a cut substantially in accord with the plans.

Cathroe testified that in making the inspection he ignored the plan profile data which informed him of the surface elevation and the depth of the cut, because the plans were small and computations could not readily be made in tenths. In this connection he also ignored the 1.12 to 1.16 feet variance between the plan surface elevations and his own surface elevations, and the same variance between what the plans told him he had to dig and what his inspection showed.

The contract called for construction according to certain plans. Every bidder-contractor was instructed to submit his bid in reliance on these plans. The plans showed adequate data pertaining to invert elevations, surface elevations and excavation cuts. From a study of the plans alone, the bidder-contractor had sufficient data available to enable him to determine how deep to dig at any point along the line of construction. Nor would the use of U. S. G. S. datum result in a different depth. To illustrate, using any base, the plans called for a cut of 11.5 feet at station 0+00. The application of U. S. G. S. datum to the plans merely would have resulted in a uniform change in all the elevation figures, the depth of the cuts would have remained the same, and the sewer would have been laid exactly in the place that it was.

Under standard engineering practice plaintiff had the right to assume that the data shown on the plans reflected U. S. G. S. datum. But this practice did not carry with it the additional right here exercised by Cathroe in his inspection, namely, the right to use part of the data and to ignore the rest of the data. Cathroe ignored the profile data shown on the plans and accepted in its stead survey data obtained independently of the plans. He claims he ignored the profile data because it did not respond readily to computation in tenths, yet he accepted in its stead survey data which varied from the ignored profile data by over one foot.

At the time of taking each test boring Cathroe was necessarily aware of the following variance: (1) His ground surface elevation, obtained independently of the plans, varied from the profile data shown on the plans by over one foot; (2) his additional computation as to how deep to drill, varied from the depth of the cut required by the plans by over one foot. Plaintiff chose to rely on Cathroe's tests and, electing not to question the variance as required by the specifications, submitted its bid thereon.

If in the illustration above drawn the bidder-contractor had drilled a test boring of 10.5 feet inadvertently or intentionally and then had submitted his bid in reliance thereon, he would not have been entitled to extra compensation because in actual construction he was compelled to dig 11.5 feet as required by the plans and in so doing had found more water than his 10.5 feet test boring had indicated. We think that plaintiff is in no better position in the instant case. Our thought in the matter is that laying the sewer at the invert level of the old sewer structure, constituted sub-

stantial compliance with the contract. To us the instant case is one where a contractor encountered more water in digging a ditch according to the contract, than he had anticipated. Such a case fails to state a cause of action for extra compensation.

The judgment of the District Court is reversed, and the cause is remanded with instructions to proceed in accordance with this opinion.